# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

SCHMITTY'S CITY NIGHTMARE, LLC,

          Plaintiff,

     v.                                 Case No. 04-C-383

CITY OF FOND DU LAC,

          Defendant.

## DECISION AND ORDER

      In 2002 Schmitty's City Nightmare, a limited liability company, purchased a building in the

City of Fond du Lac in an area zoned "B-3". At the time the city allowed adult nightclubs to be

located in areas with that zoning designation, but in 2003 the city amended its zoning ordinance to

allow such operations only in areas zoned B-5 and B-6. At issue in this case are not the zoning

designations themselves so much as the nature of the businesses regulated under the zoning

ordinance. The Fond du Lac ordinance defines the scope of the businesses regulated, including the

type of clothing that may be worn by performers and the types of actions they can engage in.

Though the plaintiff had not yet opened for business in 2003, this ordinance put a substantial crimp

in its business plan. According to Mike Schmitz, a principal of the plaintiff company, "the plaintiff

seeks to present dance entertainment with a more erotic message but has refrained from doing so

because it fears prosecution by the City of Fond du Lac under the ordinances at issue in this case."

(Schmitz Declaration, ¶ 19). Instead of offering such entertainment, the plaintiff's venue offers a

less erotic "message" of somewhat broad and indefinite scope. Sometimes it offers entertainment in the form of dancers wearing swimsuits; other times its patrons (mostly teens, apparently) are entertained by rock and roll bands.

It seems, however, that Schmitty's had a problem with its patrons congregating outside its business. During the summer of 2004, for example, police officers would harass customers who were either waiting in line to enter or who were "enjoying the cool of the evening" during, say, a break in the music. (PPFOF ¶ 27.) Both the patrons and the musicians tended to be high school aged, and sometimes the musicians would join the patrons outside during such breaks. (PPFOF ¶ 37.) On one occasion in particular, a Fond du Lac officer came on two separate occasions to warn the teens to disperse, go back inside, or face a loitering violation. Other times, the owners of Schmitty's were warned that its customers could not loiter outside the establishment. Once an officer threatened to shut the place down if he had to return a third time on the same evening. (PPFOF ¶ 40.)

Schmitty's challenges both the adult oriented zoning ordinance as well as the loitering ordinance. It claims that both laws threaten its business and impinge upon the protected rights of its patrons. Both parties have moved for summary judgment. For the reasons stated below, the plaintiff's motion will be denied and the city's motion will be granted.

**I. Fond du Lac Loitering Ordinance**

**A. Standing**

Schmitty's challenges the scope of several sections of Fond du Lac's loitering ordinance, arguing that the ordinance is vague, a violation of due process, and a violation of the First

2

Amendment right to associate.[1]  Notably, none of the customers who were threatened with loitering offenses by police are plaintiffs in this case.  Instead, Schmitty's argues it has standing to challenge the ordinance on its customers' behalf; it also claims it has independent standing based upon injuries to its business.

Generally, to have standing to sue in federal court, a plaintiff must allege (1) it has suffered an injury in fact (2) that is fairly traceable to the action of the defendant and (3) that will likely be redressed with a favorable decision.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).  Relying largely on the Eleventh Circuit's decision in *White's Place v. Glover*, 222 F.3d 1327 (11th Cir. 2000), Fond du Lac suggests that the injuries allegedly suffered by customers lingering outside of an establishment cannot constitute the basis of that establishment's own standing.  In *White's Place*, the employees of a strip club were protesting a state court ruling affecting the ability of the employees to dance nude.  A police officer arrived and apparently ordered them to disperse.  A city ordinance made it a misdemeanor "for any person to resist or oppose a police officer . . . in the discharge of his duties under the laws of the City."  *Id.* at 1328.  The strip club itself, and not the protesting employees, brought suit to enjoin enforcement of the ordinance, but the Eleventh Circuit found it lacked standing to bring the case on its own:

> It is difficult to discern how the normal conduct of the corporation's affairs will involve opposition to police officers. Even if employees of the establishment do oppose a police officer and are arrested, any criminal charges are personal in consequence. The corporation itself has not, and could not, be arrested for opposing a police officer.  Any hypothetical injury to the corporation is too speculative to provide a basis for standing.

222 F.3d at 1329-30 (citations omitted).

_____

[1]The text of the ordinances at issue in this case may be found in the appendices attached to the plaintiff's brief in support of the motion for summary judgment, Docket # 14.

Fond du Lac argues that the case is essentially identical to the facts here. In fact, while *White's Place* involved a corporation's employees, in this case we are merely talking about the company's customers, a more attenuated relationship. If the customers are actually arrested for loitering, that is their business and none of Schmitty's.

But the plaintiff's standing here is not limited to third-party standing–it claims it has standing independent of, or in addition to, its customers. As noted, on one occasion an officer threatened to shut Schmitty's down if the officer had to return a third time that night. This was a direct threat of injury to Schmitty's business itself, a threat of loss based upon the very ordinance Schmitty's now challenges. When viewed in combination with the multiple warnings issued to Schmitty's patrons, Schmitty's fear of losing business is credible and traceable to the ordinance. Because Schmitty's itself is now operating under the cloud of injury caused by enforcement of the loitering ordinance, I find that it has sufficient standing to challenge that ordinance.[2]

### B. Vagueness and Overbreadth

Loitering ordinances are subject to vagueness and overbreadth challenges because they touch on behavior, such as picketing, leafleting, or simply gathering and freely associating, that is protected by the First Amendment. An overly vague or broad ordinance would allow prosecution for standing on the sidewalk based upon the "whim of any police officer," something that is "not compatible with our constitutional system." *Papachristou v. City of Jacksonville,* 405 U.S. 156, 168-69 (1972). The ordinance in question, § 9.05 of Fond du Lac's municipal code, begins with a subsection consisting of a general loitering provision (adopted from the Model Penal Code) and

---

[2]Because I find Schmitty's has standing independent of its customers, there is no need to address its claim that it has third-party standing based on the overbreadth doctrine.

4

is followed by six subsections governing more specific behavior. The first subsection reads as follows:

> 9. 05 LOITERING AND PROWLING. (1) LOITERING. No person shall loiter or prowl in a place, at a time or in a manner not usual for law abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity. Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon appearance of a peace officer, refuses to identify himself or manifestly endeavors to conceal himself or any object. Unless flight by the actor or other circumstances makes it impracticable, a peace officer shall, prior to any arrest for any offense under this section, afford the actor an opportunity to dispel any alarm which would otherwise be warranted by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this section if the peace officer did not comply with the preceding sentence or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm.

As noted, this subsection was borrowed from the Model Penal Code; the same ordinance has also been approved of by the Wisconsin Supreme Court. In *City of Milwaukee v. Nelson,* 439 N.W.2d 562, 566-68 (Wis. 1989), the court found Milwaukee's ordinance constitutionally acceptable because loitering was narrowly limited to activity occurring "at a time or in a manner not usual for law abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity." This qualifier served to limit the ordinance's applicability to a much narrower subset of activity than would be the case had the ordinance merely prohibited "loitering" in a more vague sense.

The plaintiff concedes that subsection (1) is constitutionally sound and instead focuses its challenge on several other subsections of the ordinance. For example, in its view the most glaring example of overbreadth is § 9.05(7)(c), which reads:

> (c) Places of Public Assembly or Use. No person shall loiter, lounge or loaf in or about any depot, theater, dance half, restaurant, store, sidewalk, parking lot, or other

5

> place of assembly or public use after being requested to move on by any police officer or by the owner or other person in charge of such place. Upon being requested to move, a person shall comply immediately with such request by leaving the premises or the area.

This section is too broad, the plaintiff argues, because it could apply to clearly protected activity like leafleting, or the peaceable assemblage of those simply standing in line to get into Schmitty's.[3] Once the officer (or whoever is "in charge of such place") tells someone loitering to move along, such person "shall comply immediately" by leaving the premises. In essence, under Schmitty's reading of the ordinance, it would grant carte blanche to police officers (and others) to turn peaceful loiterers into criminals merely upon their own say-so. All it takes is a *diktat* to move, regardless of what the person is doing, and anyone resisting will have committed a crime. Such an ordinance would clearly flunk constitutional review. *City of Chicago v. Morales*, 527 U.S. 41 (1999).

The defendant defends the ordinance by arguing that subsection (1), which the plaintiff concedes is acceptable, actually governs the entire section. In particular, subsection (1) provides that "a peace officer shall, <u>prior to any arrest for any offense under this section</u>, afford the actor an opportunity to dispel any alarm which would otherwise be warranted by requesting him to identify himself and explain his presence and conduct." The "alarm" refers to "circumstances that warrant alarm for the safety of persons or property in the vicinity." That is, before an officer arrests anyone for failing to move upon request (an "offense under this section"), the officer must ask the individual what he is doing and, unless it is cause for "alarm," the individual cannot be arrested.

---

[3]Like many courts, I am using the term "overbroad" imprecisely. Here, I simply mean that the ordinance is alleged to prohibit or restrict more activity than is constitutionally permissible. As discussed in section III below, however, overbreadth is itself a distinct constitutional doctrine.

6

Subsection (1) continues, "No person shall be convicted of an offense under this section if the peace officer did not comply with the preceding sentence or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm."

I find that this limitation based on potential danger to safety or property logically applies to all of the other subsections the plaintiff contests. By its own terms, it refers to "this section" rather than merely to subsection (1). Moreover, it is both logical and reasonable to conclude that, rather than enacting a patently unconstitutional ordinance allowing officers to arrest people on their own whim, Fond du Lac intended that the officer engage in a colloquy with anyone loitering before any arrest ensued. Thus, the limitation's plain use of the term "this section" should be read to apply to all parts subsections of § 9.05.

If subsection (1) does in fact apply to the entire section, as I have found, the plaintiff rightly concedes that the rest of its objections are unfounded. Subsection (7)(b), for instance, prohibits loafing or loitering in groups or crowds in a fashion similar to subsection (7)(c), and the plaintiff claims that it makes no exception for peaceful public gatherings of protest, prayer vigils, demonstrations, etc. But in none of those cases would the officer have legitimate cause for alarm for the safety of persons or property. This also holds true of the plaintiff's challenges to subsections (6) and (7)(a), which apply to loitering in obstruction of traffic or streets, bridges, sidewalks, etc. Because subsection (1) limits these provisions, one may be arrested for loitering only when alarm is justified. The plaintiff's weakest argument relates to subsection (5), which forbids any person to "lodge in any public building, structure or place without the permission of the owner." It is hard

7

to see how anyone "lodging" in a building without permission could be exercising protected First Amendment rights. Free speech protected by the First Amendment has been construed to include free association, art, demonstrations, flag burning, and, as discussed below, even explicit sexual demonstrations. As far as I am aware, however, it has not included the right to take up residence or sleep in public buildings. Even if it did, however, the limitation of subsection (1) would make subsection (5) permissible.

My construction of § 9.05 answers the plaintiff's challenges on overbreadth, due process and vagueness grounds because the ordinance is narrowly directed only at loitering activity from which alarm might reasonably result, *see Nelson,* 439 N.W.2d at 568-69, and there is of course no protected right to cause alarm by loitering. Perhaps anticipating this result, the plaintiff devotes great energy in its response/reply brief to cautioning that federal courts must not rewrite statutes (especially state statutes) in order to make them constitutionally permissible. As the Seventh Circuit has noted,

> We are well aware of the rule requiring courts to construe statutes consistently with the Constitution, if the language will bear any such construction. But the qualification that the language must be able to bear the constitutional interpretation is an important one. Courts cannot redraft statutes so that they read the way Congress might have written them, or should have written them. Instead, we must take the laws as they are given to us and work with them.

*French v. Duckworth,* 178 F.3d 437, 442 (7th Cir. 1999), *rev'd on other grounds by Miller v. French,* 530 U.S. 327 (2000)(citations omitted). But my construction of § 9.05 here is not a redrafting of the ordinance at all; I simply applied the plain words of the ordinance itself to find that arrests under "this section" may not occur unless there is cause for alarm. Thus, while I am mindful

8

of the deference owed to legislatures and municipalities, I do not believe those concerns are implicated here. Accordingly, because I conclude that subsection (1) of the loitering ordinance applies to limit the entire section, I find the ordinance permissible.

## II. Fond du Lac Adult Entertainment Zoning Ordinance

Schmitty's also challenges Fond du Lac's zoning ordinance, which places restrictions on businesses operating as adult cabarets and other adult entertainment facilities. Before addressing the specifics of Schmitty's challenge, however, it is necessary to sort out the proper approach to evaluate its claims. Fond du Lac claims that the ordinance at issue here is a "time, manner, place" ordinance similar to the one analyzed in *Renton v. Playtime Theaters, Inc.,* 475 U.S. 41 (1986). There, the court noted that the city's ordinance did not ban adult theaters outright, but merely provided that "such theaters may not be located within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, park, or school." *Id.* at 46. It also found that when such ordinances are directed not at the "content" of the adult-related entertainment but at their "secondary effects" (e.g., prostitution, lower property values, etc.), the ordinance may be viewed essentially as a content-neutral one. When such is the case, the ordinance is constitutionally acceptable if it serves a substantial governmental interest and allows for reasonable alternative avenues of communication. *Id.* at 50.

Schmitty's, on the other hand, says the Fond du Lac ordinance should be analyzed in terms of overbreadth, which it argues is a line of First Amendment analysis wholly independent of the "time, manner, place" framework at issue in *Renton* and other zoning cases. Essentially, though it

9

recognizes that an overbreadth challenge is "strong medicine," it claims that the definitions of "adult entertainment" and "adult cabaret" simply prohibit too much expressive activity and are thus overbroad on their face. *New York v. Ferber,* 458 U.S. 747, 769 (1982).

The parties are perhaps to be forgiven for the confusion regarding the proper method of proceeding here. As one commentator has noted, "[m]ore than fifty years after its inception, First Amendment overbreadth doctrine remains little understood." Richard H. Fallon, Jr., *Making Sense of Overbreadth,* 100 Yale L.J. 853, 853 (1991). At first glance, it would seem that in this context there is little meaningful distinction between an overbreadth analysis or a result reached under the *Renton* time, manner, place framework. Indeed, in a zoning case like this, it appears courts have viewed overbreadth as simply another way of stating that the ordinance in question is not tailored towards the harmful secondary effects a government may permissibly regulate.

> [T]he overbreadth doctrine guards against the suppression of protected speech unconnected to the negative secondary effects cited as legislative justification. When the government restricts speech not associated with harmful secondary effects, then the government cannot be fairly said to be regulating with those secondary effects in mind and the regulation extends beyond its legitimate reach.

*Schultz v. City of Cumberland,* 228 F.3d 831, 849 (7th Cir. 2000)(citations omitted).

But the overbreadth versus time-manner-place distinction is not simply a matter of semantics. Although the ultimate question in this case is whether the ordinance impermissibly burdens activity that may not legitimately be burdened by the government, the overbreadth doctrine is intertwined with important principles of standing. Specifically, a facial challenge to the overbreadth of an ordinance allows a plaintiff not himself injured by the ordinance to sue on behalf of third parties. *See Virginia v. Hicks,* 539 U.S. 113, 118 (2003)("The First Amendment doctrine

10

of overbreadth is an exception to our normal rule regarding the standards for facial challenges."); *see also Lounge Management, Ltd. v. Town of Trenton,* 580 N.W.2d 156, 164-66 (Wis.1998)(Steinmetz, J., dissenting).  As the Seventh Circuit has put it,

> We recognize that in the First Amendment overbreadth area, courts have taken a more liberal approach (under the prudential branch of the standing doctrines) to the ability of one private party to assert the rights of another party. This typically occurs only where the court is convinced that the party whose rights are most clearly implicated may not be in a position to assert those rights effectively. In such situations, a court may grant third-party standing to avoid "chilling" the free speech rights asserted.

*United States v. Holm,* 326 F.3d 872, 875 (7th Cir. 2003).

Thus, under the facial overbreadth doctrine, parties who have not been injured may sometimes stand in the place of those who potentially might be injured.  It is clear, then, that overbreadth is a corollary of standing.  If the plaintiff's predominant basis for standing is the potential injury to third parties not before the court, it is clear that overbreadth analysis should control because it is that analysis, rather than the *Renton* framework, that takes into account both the prudential standing concerns the Supreme Court has flagged as well as the "strong medicine" of invalidating an ordinance based on hypothetical or unrealized harms.

Here, most of the plaintiff's challenge to Fond du Lac's ordinance is indeed based upon third-party standing, and the entirety of its legal position is based on a facial, rather than an as-applied, challenge to the ordinance.  (*See* Pl's. Concl. Of Law, Docket #17.)  It is also clear that it wishes to proceed based on an overbreadth challenge.  Thus, I conclude that the overbreadth analysis should control its challenge because, absent that exception to traditional standing principles, the plaintiff has no means of challenging most of the provisions at issue here.

11

Though the approaches detailed above might be similar, the distinction is not academic because the overbreadth analysis involves a more stringent standard.[4]  "The scope of the First Amendment overbreadth doctrine, like most exceptions to established principles, must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted." *Ferber,* 458 U.S. at 769.  Thus, an invalidation of a law based on overbreadth is strong medicine to be used only as a last resort, and the plaintiff's hurdle is therefore higher.  It is not simply a question of whether the statute might possibly regulate some activity not associated with secondary effects; instead, "[f]or a facial overbreadth challenge to be successful, plaintiffs must establish "a *realistic danger* that the statute itself will *significantly compromise* recognized First Amendment protections of parties not before the Court." *Pleasureland Museum, Inc. v. Beutter,* 288 F.3d 988, 996 (7th Cir. 2002)(quoting *Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)(italics added)).   Indeed, "there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law. . ." *Virginia v. Hicks,* 539 U.S. 113, 118-19 (2003).  Thus, the Supreme Court has held that the speech restriction's "application to protected speech [must] be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth." *Id.* (citation omitted).  The claimant challenging the law as being unconstitutionally overbroad bears the burden

---

[4]The Sixth Circuit has aptly framed the issue thus: "One of the reasons that it was important as a preliminary matter to determine the type of claim raised is that the nature of the challenge affects that standard upon which it is judged. A party attempting a facial challenge carries a 'significantly heavier burden' than in a challenge of just a particular application of the law." *Spingola v. Village of Granville,* 39 Fed. Appx. 978, 981 (6th Cir. 2002).

12

of demonstrating, "from the text of [the law] and from actual fact," that substantial overbreadth exists. *Id.* at 121.

## A. Clothing

Having established the proper standard to apply, I will now proceed to the numerous challenges Schmitty's brings to various provisions of the ordinance. It challenges the clothing provisions of the ordinance on the grounds that the amount of clothing regulated is too broad. Fond du Lac's ordinance prohibits the operation of any "adult oriented establishment" within 500 feet of any other such establishment, school, playground, church, etc. § 11.03 E.18.b(2). It further defines "adult oriented establishment" as, *inter alia,* any establishment featuring adult entertainment or adult cabaret. Both adult entertainment and cabaret are defined as places where performers exhibit "specified anatomical areas." § 11.08.E.18.a (3), (4). The ordinance defines such areas as

> Less than completely and opaquely covered human genitals, human buttocks and human female breast below a point immediately above the top of the areola; and human male genitals in a discernibly turgid state, even if completely and opaquely covered.

§ 11.08.E.18.a (6).

Schmitty's argues that the ordinance would therefore regulate establishments where dancers wear string bikinis, G-strings, and the like because the buttocks would not be completely covered; for dancers wearing small bikini tops, part of the breast would be revealed below the areola (presumably on the breast's sides and bottom). Dancers wearing bikinis have not been associated with any negative secondary effects, Schmitty's argues, so the city may not permissibly regulate that kind of activity.

13

A virtually identical ordinance was discussed in *MDK, Inc. v. Village of Grafton,* 345 F. Supp.2d 952 (E.D. Wis. 2004). There, Judge Adelman found that the ordinance regulated a great deal of activity not associated with pernicious secondary effects:

> In fact, such provisions regulate establishments that regularly feature dancers whose buttocks are almost entirely covered – in the words of the ordinance, "less than completely and opaquely covered" – and whose breasts are mostly covered – in the words of the ordinance, covered "below ⋯ the top of the areola." § 9.35.020(w)(2). A G-string would not cover all of the buttocks. Nor would the bottom of a bikini bathing suit. In fact, only the most conservative of bathing suit bottoms would cover all of the buttocks. Further, pasties would not cover all of the breast below the top of the areola. Nor would a substantial number of bikini tops. Thus, the effect of Ch. 9.35 is to regulate establishments in which dancers wear two-piece bathing suits with conservative bottoms and tops that cover much of their breasts.

345 F. Supp.2d at 958.

I agree with Judge Adelman's conclusion that an ordinance that so regulated dancers wearing "two-piece bathing suits with conservative bottoms and tops that covered much of their breasts" would be unconstitutionally overbroad since it would regulate expressive conduct not associated with the harmful secondary effects from which the city was entitled to protect the community. *See R.V.S., L.L.C. v. City of Rockford,* 361 F.3d 402, 413 (7th Cir. 2004). But I disagree with Judge Adelman's conclusion that the language of the ordinance must be so read. In fact, the city denies that the ordinance is leveled at women dancing in bikinis or other, more tame, entertainment, claiming that the ordinance should be read as being geared solely toward regulating adult oriented establishments in the traditional sense. In my view, § 11.08 E 18.a(6) is ambiguous and can be reasonably read more narrowly so that it does not apply to the more conservative performances upon which Judge Adelman based his determination.

14

Judge Adelman construed the definition of "specified anatomical areas" so that the phrase "less than completely and opaquely covered" modified all three of the described parts, namely, "human genitals, human buttocks and human female breast below a point immediately above the top of the areola." Read in this way, the ordinance regulates performers that, as Judge Adelman noted, remain clothed in the kind of two-piece bathing suit one sees at a public beach. But the language can also be read so that the phrase "less than completely and opaquely covered" applies only to the first part, the "human genitals," and not to the "human buttocks" and the specified part of the female breast. If construed in this manner, the ordinance would only apply to entertainment in which the human genitals would be displayed with less than a complete and opaque covering, or the human buttocks or the human female breast below a point immediately above the top of the areola were completely, or almost completely, displayed. The ordinance would also cover entertainment in which the male genitals were in a "discernibly turgid state," even if they were completely and opaquely covered. Construed in this way, the entertainment covered by the regulation is limited to the kind that has been shown to produce the types of harmful secondary effects that have been found sufficient to justify the limitations created by it. *See Renton; Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976); and *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988 (7th Cir. 2002).

As with the loitering ordinance, adopting such a construction would not amount to my rewriting the city's ordinance. Given its language and structure, the ordinance is "readily susceptible to such a construction." *Reno v. A.C.L.U.*, 521 U.S. 844, 884 (1997). This construction is also consistent with the intent stated in the preamble to the ordinance to avoid suppression of "any

15

speech activities protected by the First Amendment." (Aff. of Remzy D. Bitar, Ex. 11 at 2.)  I therefore adopt the more narrow construction and conclude that Fond du Lac's ordinance is not overbroad because of its definition of "specified anatomical areas."

### B. Frequency Qualification for Adult Cabaret

The ordinance regulates adult oriented establishments, which include any premises used for adult cabaret or adult entertainment.  The ordinance defines "adult entertainment" as a building or structure "regularly used" for live adult performances.  But the definition of "adult cabaret" has no such limitation.  Adult cabaret is simply defined as a "building which features topless dancers, strippers, male or female impersonators, or similar entertainers . . ." § 11.08 E.18.a.(4).  Schmitty's seizes on this distinction and argues that because adult cabaret is not limited to structures "regularly used" for adult performances, the ordinance would apply to any premises which *ever* (even once) featured such dancers.  As an example, it maintains that the ordinance would regulate a local hotel featuring the Chippendales dancers once per year to entertain "deer-hunting widows" during deer hunting season.  It would also prohibit buildings from hosting occasional bachelor parties that included strippers.  Society will not break down and crumble, the plaintiff maintains, if the local Radisson features the Chippendales for two nights in November.  Thus, in the plaintiff's view, because there is no evidence that such temporary adult performances have any link to the secondary effects that are usually associated with full-time strip clubs or other adult businesses, the ordinance is unconstitutionally overbroad.

16

The frequency limitation – the word "regularly"– was an important factor in the Seventh Circuit's analysis in *Schultz*. There, the court addressed definitions of adult entertainment and adult cabaret that were *both* limited to establishments that "regularly" featured such performances. 228 F.3d at 850. Although the dictionary definition of "regularly" could be read broadly, the court applied a narrowing construction and concluded that the ordinance referred only to those establishments that *always* featured such adult performances. "This construction limits the Ordinance to adult-entertainment establishments, which always feature nudity, semi-nudity and specified sexual content, and excludes theatrical venues that present shows like *Hair* or *Equus* for long stretches but not on a permanent basis." *Id.* The parties seem to agree that unless the definition of Fond du Lac's ordinance is similarly limited, it will be overbroad.

There is, of course, no applicable limiting construction here because the definition of adult cabaret lacks the word "regularly". In the city's view, however, that is not fatal. It offers a five-part analysis to support the notion that the ordinance, despite its omission of the word "regularly," actually regulates only those establishments whose normal or regular use includes adult entertainment. (Def. Br. at 50-51.) In addition, the ordinance's preamble states that it does not apply to protected expression. Thus, it would be reasonable to conclude that the definition of adult cabaret should be read as if the word "regularly" (or "always") appeared therein.

Where there is a gap in legislative language, a court should not generally take up the role of a legislator and interpolate its own preferred language, especially when the ordinance uses the term "regularly" elsewhere, such as in its definition of "adult entertainment." Further, the plaintiff

17

again cautions, federal courts should be wary of applying saving constructions to statutes or ordinances written by state and municipal legislatures.

But courts do not interpret statutes in a vacuum, and they need not cling to legislative text when a statute's construction would offend common sense or would violate the very purpose for which the statute or ordinance was enacted. Here, for a number of reasons, I am convinced that the ordinance's omission of the word "regularly" is not fatal because the ordinance only makes sense as it is applied to establishments that regularly feature adult entertainment.

Most persuasive on this score is the fact that this is a common zoning ordinance. Zoning rules generally only apply to the regular use of a building; a residential house, for example, does not become zoned as a commercial hotel by virtue of having the occasional overnight guest. This is reflected in Fond du Lac's ordinance itself. Section 11.08, which is at issue here, governs land "uses," and "use" is defined as "[t]he purpose or activity for which the land, or building thereon, is designed, arranged or intended, or for which it is occupied or maintained." § 11.15(c). Thus, it is evident that one must look to the intended purpose or design of a structure to determine its use. With this in mind, it is eminently reasonable to conclude that the definition of adult cabaret means a nightclub or other venue in which live adult entertainment is regularly offered.

This is underscored by the rest of the ordinance, and in particular the definition of "adult oriented establishment." Structurally, the ordinance does not regulate adult cabarets *per se,* but only adult oriented establishments, of which adult cabaret is one defined type:

18

> Adult Oriented Establishment.  Any premises including . . . adult bookstore, adult motion picture theater, adult entertainment, adult cabaret, or any other place of business of similar purpose, operation or function regardless of whether any other use is also conducted on the premises.

Section 11.08 E. 18. a.  Two things stand out about this definition.  First, adult cabaret is only one example of an adult oriented establishment, and thus regardless of how cabaret is defined within the ordinance, it is only regulated inasmuch as it is part of an "adult oriented establishment".  It would do violence to the meaning of both "oriented" and "establishment" to conclude that a venue offering only occasional adult entertainment could constitute an establishment "oriented" to adult entertainment.  Second, the definition just quoted speaks to "any other place of business of similar purpose, operation or function."  That language, while not dispositive of the issue, supports the notion that it is the purpose or function of an establishment (i.e., that to which it is "oriented") that is regulated and not infrequent or happenstance adult performances.

Finally, the common English usage of a term like "adult cabaret" lends itself to this construction.  One would not call a bar a "martini bar" if it served martinis only once a year, just as one would not call a club a "jazz club" if 99% of its music was rock and roll.  Suffice it to say that in the English language, when an adjective, such as "adult" (as used here), modifies a noun that is a physical location (a structure or building which features topless dancers, strippers, male or female impersonators, or similar entertainers), we assume that the adjective has temporal permanence just as the physical structure does.  Accordingly, for these several reasons, I find that the definition of adult cabaret logically applies only to those establishments that regularly (i.e.,

19

normally, or as a matter of course) feature topless dancers, strippers, male or female impersonators, etc.

Even if this construction of the ordinance proves untenable (and here is where the overbreadth analysis comes in) I do not believe it wise to invalidate the ordinance in a facial challenge like this one. The plaintiff's purported concerns about the occasional Chippendales performance are solely the province of speculation. As such, the envisioned overbroad applications of the law do not constitute real and substantial threats that any protected speech will be chilled.

> Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect-at best a prediction-cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep. It is our view that it is not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied.

*Broadrick v. Oklahoma,* 413 U.S. 601, 615-616 (1973). The plainly legitimate sweep of this ordinance vastly outweighs any potentially unconstitutional applications. Accordingly, even if the definition of adult cabaret did apply to venues that infrequently offered adult performances, it would be better to evaluate those claims on an as-applied basis rather than on a facial overbreadth challenge like this one. *See Schultz,* 228 F.3d at 850. ("those performers can bring as-applied challenges to the Ordinance at that time, assuming Cumberland enforces it against them. In a facial challenge like this one, there must be a realistic danger that the Ordinance will significantly compromise the First Amendment rights of parties not before the Court.")

20

### C. Live Performances

Schmitty's also claims the definition of adult cabaret is overbroad because it is not limited to *live* performances and thus could be applied to establishments that show adult films. As such, it claims that even the showing of movies like *Schindler's List* (which apparently contained nudity) would invoke the ordinance's regulation. This contention, however, is specious. Live entertainment is the essence of cabaret; according to the American Heritage Dictionary, cabaret means "a restaurant or nightclub providing short programs of live entertainment." (3d. ed., 1997). Thus, it is difficult to believe that the ordinance governing adult cabaret would be applied to theaters showing artistically valuable movies that contained nudity.

### D. Exception for Serious Works of Art

Schmitty's also claims that the ordinance is overbroad because its definitions of adult entertainment and cabaret contain no exception for "serious" works of art. In other words, the ordinance as written would impermissibly prohibit some theater or dance productions containing nudity that would fall within the definitions of adult entertainment or cabaret. Because none of these types of performances would have any bearing on the secondary effects the city is entitled to curtail, Schmitty's argues the ordinance is overbroad. It would appear correct that the ordinance must exempt the sort of artistic expression that does not fall within what is generally understood as "adult" entertainment. "Unlike statutes upheld against overbreadth challenges in other cases, the Ordinance contains no explicit exception for expression that contains nudity or sexual depiction but also possesses serious artistic, social or political value." *Schultz,* 228 F.3d at 849-50. But , as noted above, the *Schultz* court construed "regularly" to mean "always," and found that it would only be

Case 1:04-cv-00383-WCG    Filed 09/30/05    Page 21 of 25    Document 52

the rarest of theaters that would "always" show artistically or socially redeeming movies or live performances that happened also to contain nudity. Thus, there was little danger of a chilling effect because "the Ordinance's unconstitutional applications would not be real and substantial in relation to its plainly legitimate sweep." *Id.* at 850. The same holds true here. Given my conclusion that adult cabaret is limited to those establishments that regularly offer the regulated entertainment, it is hard to imaging any unconstitutional applications of the ordinance. The plaintiff's overbreadth challenge therefore fails.

### E. Simulated Sexual Activity

Schmitty's also argues that the ordinance too broadly regulates performances involving erotic touching or simulated sexual intercourse. The ordinance regulates adult entertainment and cabaret that features "specified sexual activities," which are defined as

> Human genitals in a simulated or actual state of sexual stimulation or arousal; acts of sexual intercourse, masturbation, sodomy, bestiality, necrophilia, sadomasochistic abuse, fellatio or cunnilingus; fondling or other erotic touching or sexual stimulation of human genitals, pubic region, buttocks, or female breast.

§ 11.08.E.18.a (7). Schmitty's does not challenge the entire definition; obviously the city has a right to regulate acts such as bestiality and necrophilia. Instead, it takes issue only with the ordinance's regulation of "fondling or other erotic touching," behavior which presumably it wants its dancers to be able to engage in.

Schmitty's cites cases finding overbroad ordinances involving erotic touching or simulated sexual activity, but Fond du Lac argues that the cases Schmitty's relies on were total bans on such activity rather than zoning cases. As such, the laws in those cases did not allow adequate alternative

22

avenues of communication, whereas Fond du Lac's ordinance would allow such activity in the specified zoning areas.

Schmitty's argues that regardless of the fact that Fond du Lac's is a zoning ordinance rather than a ban, the city has no business regulating this kind of activity at all. It argues that artistic performances or Elvis impersonators would be swept within the ordinance's definition and that, because such activities are not related to any secondary effects, the ordinance is overbroad. But those concerns about artistic performances like ballet are answered by my construction of the ordinance, whereby the establishments it regulates are only those that *regularly* offer such entertainment. It is truly doubtful that any establishment would offer artistic performances (plays, ballet, and the like) on a regular basis that featured fondling or erotic touching as a matter of course. Accordingly, I find little basis to conclude that the burden on any protected activity will be substantial in relation to any of these permissible activities. Thus, while the Fourth Circuit found a similar ordinance unconstitutionally overbroad, it noted that had a limiting construction been available (such as occurred here, and in *Schultz*) the ordinance would likely have been constitutionally sound. *Carandola v. Bason,* 303 F.3d 507, 517 (2002).

But apart from Schmitty's purported concerns about Shakespeare performances and ballets which might occasionally involve a bit of "fondling" or "erotic touching," what about the ordinance's application to quasi-adult nightclubs? Can a city regulate as adult cabarets those establishments that regularly feature specified sexual activities like erotic touching? According to the Seventh Circuit, the answer would appear to be no. In what can only be described as a striking paean to such activity, the court in *Schultz* found that an ordinance regulating the "fondling or erotic

23

touching of human genitals, pubic region, buttocks, anus, or female breasts" unconstitutionally restricted the "emotional" and / or "sensual" nature of the performer's "erotic message." 228 F.3d at 847. Such a restriction "deprives the performer of a repertoire of expressive elements with which to craft an erotic, sensual performance and thereby interferes substantially with the dancer's ability to communicate her erotic message." *Id.*

The ordinance in *Schultz* is distinguishable, however, because it operated as a total ban on such activity rather than a zoning of that activity, meaning it was not a mere time, place or manner restriction. *Id.* at 846 ("In practice, it effectively bans commercial nude dancing.") As such, the court subjected it to strict scrutiny. Moreover, the court did not address that portion of the ordinance on overbreadth grounds. The standard, therefore, was much lower. Here, I conclude that the ordinance's regulation of erotic touching and fondling is not unconstitutionally overbroad. First, this kind of behavior is more explicit even than the clothing restrictions discussed earlier in this opinion. That is, it is one thing to say that a city may not regulate bikini-clad dancers; such performances have become (for better or worse) somewhat routine in our society and even appear in commercials and NFL broadcasts. But it is quite another thing to say that a city may not regulate explicitly sexual activities like fondling or erotic touching in the context of an adult entertainment establishment, i.e, an establishment that regularly would offer such performances. That is, because the ordinance applies only to establishments *regularly* offering fondling or erotic touching, the sweep of the ordinance is quite low, in contrast to the restrictions at issue in *Carandola:* "[t]he restrictions challenged here, however, sweep far beyond bars and nude dancing establishments." 303 F.3d at 516. *Id.* That court concluded it "would present a different question if we could construe

24

the challenged restrictions in a manner that removed or reduced the threat to constitutionally protected speech." *Id.* at 517. (citing *Schultz* and noting that a similar construction might solve the challenge in that case).

Accordingly, I conclude that the potentially unconstitutional sweep of the regulation of erotic touching and fondling (as applied to "artistic" performances, for example) is small in relation to the ordinance's constitutional applications. The facial challenge therefore fails.


## III. Conclusion

For the reasons stated above, I conclude that Fond du Lac's loitering ordinance and its adult-oriented zoning ordinance are constitutionally permissible regulations enacted under the city's lawful authority to protect the health, safety and welfare of the community. Summary judgment is therefore GRANTED in favor of the City of Fond du Lac, and plaintiff's action is ordered dismissed. Plaintiff's motion for summary judgment is denied.

**SO ORDERED**.

Dated this   30th   day of September, 2005.


s/  William  C.  Griesbach
William C. Griesbach
United States District Judge

25